UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ERIC TARTER, | ) |
|     Plaintiff, | ) ) ) |
| v. | ) ) NO. 3:20-cv-00513 |
| THE METROPOLITAN NASHVILLE AIRPORT AUTHORITY, OFFICER BRIAN ROBBINS, OFFICER JERRY LOVELL, and SERGEANT DALTON ENGSTROM, | ) ) ) ) ) ) ) |
|     Defendants. | ) |

## MEMORANDUM OPINION

Plaintiff Eric Tarter is suing the Metropolitan Nashville Airport Authority ("MNAA") and MNAA officers Brian Robbins, Jerry Lovell, and Dalton Engstrom (collectively, "Defendants") under 42 U.S.C. § 1983 and Tennessee law. Mr. Tarter's claims arise from an incident in which the MNAA officers detained and handcuffed him, suspecting he was attempting to commit fraud at a rental car kiosk. Mr. Tarter, the MNAA, and the MNAA officers each filed separate Motions for Summary Judgment. (Doc. Nos. 52, 54, 56). The Court will deny Mr. Tarter's motion and grant Defendants' motions because no genuine issues of material fact remain and Defendants are entitled to judgment as a matter of law.

### I. BACKGROUND

#### A. Mr. Tarter's Detention

Mr. Tarter is a citizen of Pennsylvania. (Doc. No. 69 at 1). On August 17, 2019, while traveling, he attempted to rent a car from the Hertz kiosk in the Nashville International Airport ("NIA"). (Id.). He presented a Hertz employee, Marlene Fernandez, with a First Access credit

card.  (Doc. No. 70 at 2).  Hertz employees are trained to identify potentially fraudulent credit cards because, before 2019, there were over 200 incidents of fraud at the NIA's car rental counters.  (Id. at 1).  The fraud identification training directs employees to check the bank identification number ("BIN") on customers' credit cards to see whether they match the financial institution whose name is printed on the card.  (Id. at 2).

Ms. Fernandez checked the BIN on Mr. Tarter's First Access card.  (Id.).  She noticed it did not align with the bank named on the card.  (Id.).  Ms. Fernandez used a coded term to alert her co-worker to contact the MNAA Department of Public Safety ("DPS").  (Doc. No. 66 at 3).  Her co-worker did so.  (Id.).  DPS was aware of the fraud problems that the NIA's rental car kiosks had been experiencing.  (See Doc. No. 58-3 at 5).  Eleven days prior, Lieutenant Scott Harding of the MNAA had circulated an email encouraging officers to "respond[] promptly" when kiosks reported potential frauds and warning officers that "suspects may flee."  (Id.; Doc. No. 69 at 2).

Officer Robbins responded to the alert first.  (Doc. No. 66 at 3).  When he arrived, Ms. Fernandez provided him with Mr. Tarter's First Access credit card and driver's license.  (Id.).  Shortly after, Sergeant Engstrom and Officer Lovell arrived on the scene.  (Id. at 3–4).  The officers attempted to confirm Mr. Tarter's driver's license number by searching Pennsylvania's DMV system.  (Id. at 4).  The initial search showed no results.  (Id.).

Next, Officer Lovell ran a BIN search on the First Access credit card.  (Id.).  The results showed a bank that was inconsistent with the institution named on the card.  (Id.).  Sergeant Engstrom then ran his own BIN search.  (Id.).  His results also showed a bank inconsistent with the one listed on the First Access card.  (Id. at 4–5).

The officers then asked Mr. Tarter to provide any additional credit cards he had.  (Id. at 5).  Mr. Tarter complied.  (Id.).  The officers sent pictures of the results of the BIN search on the First

2

Access card as well as pictures of all of Mr. Tarter's credit cards to Detective Brian Wolters, who was working offsite. (Id. at 5–6). Detective Wolters ran BIN searches on Mr. Tarter's credit cards and found an inconsistency in his Macy's credit card. (Id. at 6). Detective Wolters also requested a criminal history search from DPS Dispatch. (Id. at 7). The search was positive for fraud-related crimes, including providing false identity to law enforcement. (Doc. No. 70 at 4). DPS Dispatch provided the results to Sergeant Engstrom and Detective Wolters. (Doc. No. 66 at 7).

After he received the results of the criminal history search, Detective Wolters recommended that the on-scene officers handcuff Mr. Tarter. (Id.). Sergeant Engstrom passed the message on to Officer Lovell, who handcuffed Mr. Tarter. (Doc. No. 58-8 at 4). Mr. Tarter asked why he was being arrested. (Doc. No. 69 at 8). The officers told him he was not being arrested; he was "just being detained." (Id.).

The officers then removed Mr. Tarter from the Hertz counter and led him to an area of the terminal near the escalators. (Doc. No. 66 at 8). They had Mr. Tarter sit on a bench. (Id.). At one point, Mr. Tarter told the officers that his handcuffs were too tight. (Id.). In response, the officers adjusted the handcuffs. (Id.).

Later, the officers were able to verify the Macy's card. (Id. at 9). They were unable to confirm whether the First Access card was valid. (Id.). However, they were able to confirm Mr. Tarter's identity through social media. (Id.). Ultimately, they released Mr. Tarter. (Id. at 10). He had been handcuffed for 26 minutes. (Doc. No. 64 at 8). Later, Mr. Tarter acknowledged that the officers had worked to gather information as fast as they could. (Doc. No. 69 at 10).

B. The MNAA Complaint

On August 20, 2019, Mr. Tarter sent a written complaint to the MNAA. (Id.). Mr. Tarter claimed he was racially profiled, harassed, falsely arrested, and the victim of an invasion of

privacy, among other things, based on the incident at the Hertz counter. (Id.). Lieutenant Harding, who oversees the MNAA Office of Professional Accountability, conducted an investigation into the incident. (Id. at 11–12). Based on this investigation, Lieutenant Harding prepared a report finding the officers in question acted appropriately. (Id. at 11–13, 20). Lieutenant Harding then submitted the investigation report to DPS Chief David Griswold for review and approval. (Id. at 20). On September 16, 2019, Chief Griswold sent Mr. Tarter a letter informing him that he accepted the recommendations in Lieutenant Harding's report. (Id. at 21).

C. Procedural History

Mr. Tarter filed a complaint in this Court on June 18, 2020. (Doc. No. 1). He amended it on August 11, 2020. (Doc. No. 6). He later moved to dismiss a party (Ms. Fernandez) and several of his claims. (Doc. Nos. 32, 44). The Court granted both motions. (Doc. Nos. 37, 45). The MNAA and the MNAA officers filed separate Motions for Summary Judgment on January 28, 2022. (Doc. Nos. 52, 54). Mr. Tarter filed a Motion for Summary Judgment on the same date. (Doc. No. 56). The motions have all been fully briefed. (Doc. Nos. 53, 55, 57, 63, 65, 67, 71).

II. LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where there is "evidence on which the jury could reasonably find for the [non-moving party]." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

At the summary judgment stage, the moving party "has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Id. If the moving party meets its burden, "the nonmoving

4

party, must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." Laster v. City of Kalamazoo, 746 F.3d 714, 726 (6th Cir. 2014).

When evaluating a summary judgment motion, the Court must view the record "in the light most favorable to the nonmoving party." Id. It must also accept the nonmoving party's evidence "as true" and "draw all reasonable inferences in [that party's] favor." Id. The Court "may not make credibility determinations nor weigh the evidence" in its analysis. Id. And although the Court "need consider only the cited materials," it "may consider other materials in the record" if it chooses. Fed. R. Civ. P. 56(c).

## III. ANALYSIS

Mr. Tarter's remaining claims include: (1) a 42 U.S.C. § 1983 municipal liability claim against the MNAA for violations of the Fourth and Fourteenth Amendments, (2) a § 1983 claim against the MNAA officers for violations of the Fourth and Fourteenth Amendments, (3) a false imprisonment claim under Tennessee statutory law against the officers, and (4) a battery claim under Tennessee common law against the officers. Defendants are entitled to summary judgment on each claim.

    A.    The MNAA Is Entitled to Summary Judgment on Mr. Tarter's § 1983 Municipal Liability Claim.

Mr. Tarter's municipal liability claim does not survive summary judgment. "A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom." Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013). Mr. Tarter asserts that the "MNAA ha[s] an unwritten policy of unconstitutionally

5

handcuffing fraud suspects without probable cause."[1] (Doc. No. 65 at 14). It is unclear whether Mr. Tarter means that (1) the MNAA has a policy of handcuffing fraud suspects absent probable cause, which is unconstitutional, or that (2) the MNAA has a policy that literally directs its officers to break the law (by "unconstitutionally handcuffing fraud suspects"). (Id.). Either way, Mr. Tarter's argument fails.

*First*, a policy permitting MNAA officers to handcuff fraud suspects absent probable cause would not be inherently unconstitutional. Reasonable suspicion—not probable cause—is all that is required for a "Terry stop,"[2] which is an investigatory detention that does not rise to the level of an arrest. Houston v. Clark Cty. Sheriff Deputy John Does 1-5, 174 F.3d 809, 813–14 (6th Cir. 1999). The Sixth Circuit has recognized that "the use of handcuffs" does not "exceed the bounds of a Terry stop, so long as the circumstances warrant that precaution." Id. at 815. Hence, a policy allowing MNAA officers to use handcuffs in the absence of probable cause (but in the presence of reasonable suspicion) would not automatically violate any constitutional rights.

*Second*, to the extent Mr. Tarter contends the MNAA has a policy that literally directs its officers to break the law (by "unconstitutionally handcuffing fraud suspects"), this argument fails. (Doc. No. 65 at 14). Mr. Tarter appears to argue Chief Griswold's letter and certain officers' deposition testimony establishes the existence of such a policy. (Id. at 14–17). Neither the letter

---

[1] Mr. Tarter's "unwritten policy" argument appears for the first time in his response to Defendants' summary judgment motions. (Doc. No. 65 at 15). He originally advanced a "ratification" theory of municipal liability in his own summary judgment motion, contending Chief Griswold's after-the-fact letter ratified the MNAA officers' conduct and constituted an unlawful policy. (Doc. No. 57 at 14–16). But he appears to abandon that theory in his response to Defendants' summary judgment motions, conceding the "MNAA is correct that an after-the-fact ratification in itself is generally insufficient to establish an unconstitutional official policy, procedure, or custom that would subject it to liability." (Doc. No. 65 at 15).

[2] "Terry stops" are named after the Supreme Court's decision in Terry v. Ohio, 392 U.S. 1 (1968).

nor the deposition testimony supports this argument.

Chief Griswold's letter is not evidence of an unconstitutional handcuffing policy. The letter reads as follows:

> The Department of Public Safety's Office of Professional Accountability has completed its investigation into the complaint you filed against officers of this department. After reviewing the facts surrounding the incident it has been determined that no Metropolitan Nashville Airport Authority or Department of Public Safety policy was violated. The officers acted within the bounds of their legal authority during their interaction with you and have been EXONERATED of the allegations you have made against them.

(Doc. No. 1-2 at 1). Prima facie, the letter does not provide any evidence that the MNAA directs its officers to unconstitutionally handcuff fraud suspects.[3] (Doc. No. 65 at 14).

Further, the deposition testimony in this case does not include evidence of an unconstitutional handcuffing policy. Mr. Tarter points to portions of the depositions of Lieutenant Harding and Officer Robbins. (Id. at 16–17). But neither officer references any bright-line policy that the MNAA employs to determine when or if to handcuff fraud suspects (much less a policy directing officers to break the law). (Doc. No. 66-3 at 1–2; Doc. No. 69-1 at 3). Lieutenant Harding indicates MNAA officers examine the totality of the circumstances to determine when to handcuff suspects. (Doc. No. 66-3 at 1–2 ("[T]here's obviously several things in play on what helps determine if an officer handcuffs someone during detention.")). And in the relevant portion of Officer Robbins' testimony, he merely states he believes Mr. Tarter became a safety risk based

---

[3] Mr. Tarter says the letter is evidence of an unconstitutional policy because it "cleared the Officer Defendants of any policy or legal violations" even though Chief Griswold had been "presented with Lieutenant Harding's investigatory report, which found that [Mr. Tarter] was handcuffed without probable cause." (Doc. No. 65 at 17). In truth, the investigatory report found no such thing. (Doc. No. 58-9 at 1–6). It did not even mention "probable cause"; it only found that the MNAA officers had "reasonable suspicion" to detain Mr. Tarter. (Id. at 5). As noted, it is not automatically unconstitutional for officers to handcuff suspects based on reasonable suspicion.

7

on the MNAA "not being able to identify who he was," plus "the possible use of a fraudulent ID," and that "those suspects sometimes tend to run or flee the area." (Doc. No. 69-1 at 3).

No reasonable jury could find the MNAA has a policy directing its officers to unconstitutionally handcuff fraud suspects. And even if an MNAA policy permits officers to handcuff suspects absent probable cause, that is not inherently unconstitutional. Summary judgment in the MNAA's favor is warranted on Mr. Tarter's municipal liability claim.

### B. The MNAA Officers Are Entitled to Summary Judgment on Mr. Tarter's § 1983 Claim.

The MNAA officers are immune from Mr. Tarter's § 1983 claim. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Bey v. Falk, 946 F.3d 304, 312 (6th Cir. 2019) (quoting Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018)). To evaluate a qualified immunity defense, courts must determine "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." Id. (citation and quotation omitted). Courts "may grant qualified immunity on either basis and may address the prongs in any order." Id. The MNAA officers are entitled to summary judgment on qualified immunity grounds because, even assuming Mr. Tarter's constitutional rights were violated, those rights were not clearly established.

Mr. Tarter contends that, by handcuffing him, the MNAA officers violated "clearly established limits on the use of handcuffs during Terry stops."[4] (Doc. No. 65 at 13). To count as

---

[4] Even though the Amended Complaint "primarily challenge[d] the unlawful duration" of Mr. Tarter's handcuffing, his summary judgment briefings focus on challenging the lawfulness of the handcuffing in the first instance. (Doc. No. 65 at 5–6 n.1). Mr. Tarter asserts that these challenges should be analyzed together because "any amount of time that [he] spent unlawfully handcuffed is obviously an unconstitutionally prolonged seizure." (Id.).

8

"clearly established," a "rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." D.C. v. Wesby, 138 S. Ct. 577, 590 (2018) (citation and quotation omitted). "This requires a high 'degree of specificity.'" Id. (quoting Mullenix v. Luna, 136 S. Ct. 305, 309 (2015)). Courts "must not define clearly established law at a high level of generality" because "doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." Id. (citation and quotation omitted).

Here, if the officers' use of handcuffs violated a constitutional right, that right was not clearly established. Officers may use handcuffs during Terry stops if they have a "specific reason . . . to believe that the detainee poses a risk of flight or violence." Brown v. Lewis, 779 F.3d 401, 415 (6th Cir. 2015). The MNAA officers had a specific reason to believe Mr. Tarter was a flight risk: he was a fraud suspect based on his criminal history and the inconsistencies in his credit cards, and a recent MNAA email had warned that fraud suspects "may flee" from law enforcement. (Doc. No. 69 at 2, 7; Doc. No. 70 at 4, 5). Mr. Tarter has not raised any authority that clearly demonstrates this rationale is an insufficient basis for deeming a detainee a flight risk.[5] (Doc. No. 65 at 10–14). And although he complains that some of the MNAA officers did not, in reality, use this rationale as the justification for the detention (Doc. No. 57 at 11; Doc. No. 65 at 12), that is immaterial. "The facts and circumstances surrounding a Terry stop are judged against an objective

---

[5] The chief authority on which Mr. Tarter relies is Bennett v. City of Eastpointe, 410 F.3d 810, 837 (2005). (Doc. No. 57 at 9). In that case, police officers detained youths on bicycles. Bennett, 410 F.3d at 837. They "conduct[ed] pat-down searches, and uncovered no weapons or anything else to warrant further concern[.]" Id. Still, the officers placed handcuffs on the youths. Id. The Sixth Circuit held the use of the handcuffs exceeded the permissible bounds of a Terry stop. Id. This case is distinguishable from Bennett. Here, unlike in Bennett, the officers had at least found items in Mr. Tarter's possession (credit cards with inconsistent BINs) that heightened their concern that they were dealing with a person attempting to commit a crime.

9

standard, regardless of the subjective intent of the officer." United States v. Washington, No. 2:18-CR-200, 2018 WL 6727002, at *3 (S.D. Ohio Dec. 21, 2018); United States v. Saucedo, 226 F.3d 782, 789 (6th Cir. 2000) (a Terry stop's "reasonableness" determination "hinges upon objective factors, not the actual subjective motivation of the officer(s) involved").

Because any right the MNAA officers may have violated in this case was not "clearly established," the officers are covered by qualified immunity, which means summary judgment in their favor is appropriate on Mr. Tarter's § 1983 claim.

### C. The MNAA Officers Are Entitled to Summary Judgment on Mr. Tarter's False Imprisonment Claim.

The MNAA officers are also immune from Mr. Tarter's state-law claim for false imprisonment. "Tennessee's discretionary function immunity parallels the federal qualified-immunity analysis." Fowler v. Burns, 447 F. App'x 659, 663 (6th Cir. 2011); see also Rogers v. Gooding, 84 F. App'x 473, 477 (6th Cir. 2003) ("There is . . . Tennessee authority which applies qualified or good faith immunity to state law torts."). Accordingly, in Fowler, the Sixth Circuit found that where officers were entitled to qualified immunity for federal claims premised on an allegedly unlawful arrest, they were also entitled to qualified immunity for "false-arrest and false-imprisonment claims" arising from Tennessee law. 447 F. App'x at 663. This case is similar. The Court has already found qualified immunity protects the MNAA officers from Mr. Tarter's federal claims premised on their allegedly unlawful use of handcuffs to detain him. See supra Section III.B. For comparable reasons, it finds qualified immunity protects the officers from liability for Mr. Tarter's state-law false imprisonment claim, meaning summary judgment in the officers' favor is warranted on that claim.

10

Case 3:20-cv-00513 Document 72 Filed 04/22/22 Page 10 of 11 PageID #: 764

D. The MNAA Officers Are Entitled to Summary Judgment on Mr. Tarter's Battery Claim.

Finally, the Court will grant the MNAA officers' request for summary disposition of Mr. Tarter's battery claim premised on Tennessee common law. "Tennessee courts may look to federal case law on excessive force in analyzing claims of assault and battery by police officers." Murray ex rel Morrow v. Metro. Gov't of Nashville, No. 3:06-0570, 2007 WL 1521004, at *9 (M.D. Tenn. May 21, 2007); Harris v. Metro. Gov't of Nashville, No. CIV.A. 3:06-0868, 2007 WL 4481176, at *9 (M.D. Tenn. Dec. 18, 2007) ("The court's analysis regarding the plaintiffs' § 1983 claim for excessive force applies with equal validity to his Tennessee law claims for assault and battery."). Under federal case law, for an excessive force case based on handcuffing to survive summary judgment, "a plaintiff must offer sufficient evidence to identify a genuine issue of material fact that (1) he complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced some physical injury resulting from the handcuffing." Getz v. Swoap, 833 F.3d 646, 654 (6th Cir. 2016) (citation and quotation omitted). In this case, Mr. Tarter admits that the officers did not ignore his complaints that his handcuffs were too tight. (Doc. No. 70 at 7). Instead, he agrees they adjusted the handcuffs for him. (Id.). No genuine issue of material fact remains for a jury concerning Mr. Tarter's battery claim.

IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motions for Summary Judgment (Doc. Nos. 52, 54) and deny Mr. Tarter's Motion for Summary Judgment (Doc. No. 56).

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE